Daniel C. Durand III
DURAND & ASSOCIATES, P.C.
522 Edmonds, Suite 101
Lewisville, Texas 75067
(972) 221-5655
Attorney for Defendants

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE:<br>BARRY FRANK<br>3408 Bentley Court<br>Highland Village, TX  75077<br>SSN: XXX-XX-1258<br><br>*Debtor,* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 18-42131<br><br><br><br><br><br><br>CHAPTER 7 |
| AMERICAN RECEIVABLE CORPORATION<br><br>*Plaintiff,*<br><br>v.<br><br>BARRY FRANK,<br><br>*Defendant/Debtor.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br><br><br>ADVERSARY NO. 19-04001 |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

### ISSUES PRESENTED AND CONCLUSIONS

1.    Whether Barry Frank's liability is non-dischargeable under the larceny or embezzlement provision of 11 U.S.C. § 523(a)(4)? No.

2.    Whether Frank can controvert ARC's claims, damages and summary judgment evidence. Yes.

3.  Whether ARC is entitled to attorney's fees from Defendant/Debtor Barry Frank? No.

## NATURE OF ACTION

Plaintiff American Receivable Corporation ("ARC") filed this adversary proceeding asking the Court to determine that Barry Frank's ("Frank") liability to ARC is non-dischargeable, or is an exception to discharge under 11 U.S.C. § 523(a)(4), due to Frank's embezzlement or larceny. ARC alleges that Frank's current liability to ARC, exclusive of attorneys' fees and interest, is $144,510.10, although Frank disputes this entirely. Frank does not dispute openly receiving, depositing, comingling and using ARC's property which were 11 Walmart checks inadvertently sent to SKI, although Frank promptly paid all the relevant invoices by sending ARC $172,813.32 in wires and checks and allowing an additional $31,297.74 in chargebacks to his Reserve Account funds. Frank challenges the dischargeability of his liability to ARC since there was no larceny or embezzlement.

## SUMMARY

ARC is a company in the business of purchasing account receivables from businesses that provide goods and services on account such as Sweeper King Inc. ("SKI"), a company solely owned by Barry Frank. ARC and SKI entered into a Purchase and Security Agreement ("PSA") wherein ARC purchased SKI's accounts received from SKI customers including Walmart, Inc. ("Walmart"). ARC's acquisition of SKI's accounts receivable includes an immediate right to possess all payments made by Walmart relating to these accounts receivable. As a material inducement for ARC entering into the PSA and purchasing SKI's accounts, Frank signed an Individual

Guaranty Agreement ("Guaranty") whereby he unconditionally guaranteed SKI's prompt payment and performance of all of SKI's obligations to ARC, including those arising under the PSA. For a period of thirty-one (31) months, ARC and SKI operated under the PSA without any material issues, specifically including the delivery of payments by Walmart directly to ARC for invoices purchased by ARC.

In November of 2017 and continuing to March of 2018, Walmart, without prior notice to or request from ARC or SKI inadvertently delivered fourteen (14) payments totaling $310,113.16 to SKI. Of these fourteen (14) payments, two (2) have been removed by ARC from its current claims because they did not purchase the invoices from those two checks as is also true with the third check numbers #1958543, 2005105 nd 1945760. Of the remaining eleven (11) Walmart payments totaling $290,948.49, ARC only paid $204,113.06 from them and ARC thereafter received payments from Frank totaling $172,813.32 resulting in a net difference of $31,297.74 in Walmart payments received directly by Frank rather than ARC ("Walmart Misdirected Payments"). Frank retained, endorsed and deposited the Walmart Misdirected Payments, some at the specific direction and knowledge of ARC, and then wired, sent funds by mail or allowed chargebacks to the ARC Reserve Account to compensate ARC for them. The last three (3) of eleven (11) checks received by SKI totaling $31,297.74 were received after ARC terminated doing business with SKI and Frank on January 19, 2018 and refused to respond to SKI requests for ARC to verify that the amounts were correct in the event there were any additional amounts due and were reasonably expected by Frank to be recovered as chargebacks to the large Reserve Account funds which was his money held by ARC.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. On January 6, 2014, ARC and SKI entered into the PSA. Simultaneously, Frank executed the Guaranty whereby he unconditionally guaranteed SKI's prompt payment and performance of all of SKI's obligations to ARC, including those arising under the PSA except for "willful misconduct" by ARC which would expose it to liability to Frank and SKI.

    The PSA contains the following undisputed provisions:

    a. <u>Misdirected Payment</u> is any payment received by Seller (SKI) instead of Purchaser (ARC) and is to be held in trust by SKI separate and apart from SKI's own funds and is subject to ARC's direction and control. Misdirected Payments must be delivered to ARC on the next banking day following SKI's receipt of same and either paid in the identical form received or the full cash equivalent of the amount of the Misdirected Payment.

    b. <u>Purchased Accounts</u> are Accounts purchased by ARC under the PSA which have not been repurchased by Frank.

    c. <u>Accounts or Account</u> are any accounts receivable arising out of the sale of goods or performance of services by SKI during the term of the PSA.

    d. <u>Obligation or Obligations</u> includes all principal, interest, fees, charges, expenses, attorneys' fees, other amounts chargeable to SKI or incurred by ARC and all past, present and future amounts owing by SKI to ARC.

    e. <u>Collateral</u> includes all accounts and accounts receivable.

    f. <u>Reserve Account</u> is a bookkeeping account that is funded as to a Purchased Account only when the Purchased Account is paid in full and represents an unpaid portion of the Purchase Price to ensure SKI's `performance under the PSA.

    g.    All payments made by SKI's debtors (i.e. Walmart) are to be made to ARC and delivered to ARC at its address listed in the PSA and SKI's invoices relating to Purchased Accounts must include notice that the proceeds due under this invoice have been sold to ARC and payment must be made to ARC at its address provided in the PSA.

2.    The Guaranty contains the following undisputed provisions:

    a.    Guarantor (Frank) hereby unconditionally guarantees to ARC the full and prompt payment and performance of all obligations, indebtedness and covenants of SKI to ARC including, but not limited to those arising under the PSA, except for "willful misconduct" by ARC.

    b.    Guarantor's liability is absolute, immediate and unconditional guarantee of payment and not collectability.

    c.    No set-off, counterclaim, reduction, or diminution of any obligation or any defense of any kind or nature that SKI may have against ARC shall be available hereunder to Frank.

3.    ARC purchased SKI's accounts receivable, including those of SKI's customer Walmart. In return, SKI sold, transferred, conveyed and assigned to ARC all legal and equitable right, title and interest in the Purchased Accounts providing ARC with ownership of these Purchased Accounts, including all payments made or received relating to these Purchased Accounts.

4.    The Guaranty was a material inducement for ARC entering into the PSA.

5.    In November of 2017 and continuing to March of 2018, Frank directly received, endorsed and deposited into SKI's bank account the Walmart Misdirected Payments totaling $290,948.49, some with ARC's knowledge, consent and direction.

6.    There is no evidence that Frank or SKI had anything to do with Walmart sending the Misdirected Payments to SKI, and it was an error by Walmart that Frank was trying to correct.

7.    Frank admits that he should have immediately delivered to ARC all Walmart misdirected payments in full, yet did not do so within 24 hours of receipt. However, ARC chose to deviate from the PSA by having Frank wire funds to ARC's bank account. Only after ARC terminated the PSA on January 19, 2018 did Frank retain a portion of the checks due to the large Reserve Account that ARC was holding and based on past events. Frank knew ARC would chargeback to the Reserve Account (that was Frank's money) if a balance was in fact due.

8. Frank transmitted to ARC by check payments totaling $103,592.53 of the Walmart Misdirected Payments, plus wired other funds and allowed chargebacks in the amount of $69,220.79 for a total of $172,239.29, to cover the Misdirected Payments, stating, "If you believe that a different amount is correct, please provide us the numbers so that we can review them."

9. Frank retained and used the remaining $31,297.74 of the Walmart Misdirected Payments for normal business operating expenses of SKI and not personal use.

10. The PSA was in effect at all relevant times until terminated by ARC on January 19, 2018.

11. ARC did not expressly consent or agree to Frank's retention of any percentage or portion of the Walmart Misdirected Payments, although Frank argues that he had an equitable interest in a portion of the payments.

12. ARC did not respond to SKI's request to agree or disagree with its retaining a portion of the funds in its letters of 02/02/2018 and 02/15/2018.

13. On September 20, 2019, Judge Rhoades signed an order approving a settlement agreement between SKI and the Chapter 7 Trustee whereby SKI assigned its claims, damages and defenses (if any) against ARC to the Chapter 7 Trustee.

14. Per the PSA that Frank did not fully understand, ARC had an immediate right of possession of the Walmart Misdirected Payments, regardless if those payments were for invoices purchased by ARC, although ARC has withdrawn its claims for those Misdirected Payments that were not for invoices purchased by ARC.

## ARGUMENTS AND AUTHORITIES

1. Standard of review.

Federal Rule of Civil Procedure 56, which is made applicable to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056, provides that a court shall grant summary judgment on a claim or defense (or a part thereof) identified by the movant for such relief "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The purpose of a summary judgment is to isolate and dispose of factually unsupported claims. Summary

judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits [show] by a preponderance of the evidence that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." The non-movant cannot satisfy his summary judgment burden with conclusory allegations, unsubstantiated assertions, alleged factual disputes or only a scintilla of evidence. The substantive law identifies which facts are material. The Court must view the evidence in the light most favorable to the non-movant. In re Hahn, 2018 W.L. 5259294 (E.P. Tex. J. Parker 2018) citing Matsushita Elec. Indep. Co. v Zenith Radio Corp., 475 U.S. 574, 586 (1986). All exceptions for discharge must be strictly construed against the creditor and liberally in favor of the debtor so that the debtor gets a fresh start. In re Minardi, 536 B.R. 171 (E.D. Tex. J. Parker 2015).

The existence of fraud, a material element to prove embezzlement, is a question of fact. Prude v. Campbell, 85 Tex 4, 19 S.W. 890 (1892). This is true even if the evidence is circumstantial. Brian v. McGregor, 64 S.W. 78 (Tex.Civ.App. 1901). In this case, the evidence of the material fact of fraud is in conflict, so summary judgment should be denied.

2. <u>Frank's retention and use of the Walmart Misdirected Payments IS dischargeable since there was no fraud, fraudulent intent, wrongful intent, intent to deprive or even circumstances of fraud.</u>

All exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start. In

re Minardi, 536 B.R. 171, 185 (E.D. Tex J. Parker 2015), citing Hudson v. Raggio & Raggio, Inc. (In re Hudson), 107 F 3d 355, 356 (5th Cir. 1997).

The record presented in a motion for summary judgment must be reviewed in the light most favorable to the non-moving party. In re Halen, supra.

A breach of contract "is not sufficient to make a debt non-dischargeable, even though there is no excuse for subsequent breach." In re Minardi, 536 B.R. 171, 188 (E.D. Tex. J. Parker 2015), citing Turbo Alese Inv. v Borschow (In re Borschow), 454 B.R. 374, 395 (Banks v W.D. Tex. 2011). If Frank did not send the checks to ARC within 24 hours, that may be a breach of contract, but it does not prove fraud or embezzlement.

Embezzlement requires three elements (1) appropriations of funds by the debtor; (2) for the debtor's use or benefit; and (3) with fraudulent intent. In re Berkenbile, 2014 W.L. 797743 (E.D. Tex J. Parker 2014) citing Ande Group, LP v. Gamble-Ledbetter (In re Gamble-Ledbetter), 419 B.R. 682 (Bank v. E.D. Tex J. Parker 2009) citing Rainey v. Davenport (In re Davenport) 353 B.R. 150,200 (Bankr. S.D. Tex. 2006). It is this third element that ARC cannot prove by a preponderance of the evidence. Embezzlement requires a wrongful intent, intent to deprive or fraudulent intent which cannot be shown in this case since Frank sent or acted in a way to cover all of ARC's claims. Bullock v. Bankchampaign, 589 U.S. 267 (U.S. Supreme Court 2013).

Fraudulent intent is "an intent to deceive another person and thereby induce such other persons to transfer, alter or terminate a right with respect to property." In re Birkenbile, supra. A person can wrongfully appropriate property while acting under an erroneous belief of entitlement which does not prove fraudulent intent. In re Miller, 156 F. 3d. 598 (5th Cir 1998).

Fraud is defined as a knowing concealment of a material fact to induce another to act to his or her detriment. Black's Law Dictionary, (7th Ed. 1990). In this case, Frank did not conceal anything. When he first received a Walmart Misdirected Check for $15,538.25, he notified Brad Gurney of ARC and asked for instructions on how to handle it. See attached Exhibit A3. Frank openly and honestly disclosed to ARC when he received the Walmart checks and his entire course of conduct was neither fraudulent, deceitful or hidden. See attached Exhibit A – Declaration of Barry Frank (with all attached Exhibits A1 through A48).

It was Frank who first contacted ARC to tell them he was receiving Walmart checks directly for reasons unknown to him. It was Frank who asked ARC for instructions on what to do with them and he then promptly complied by sending wires, allowing chargebacks, and sending checks for what he honestly believed was ARC's portion of the money. See Exhibit A22 (chart) and Exhibits A38 and A39 (transmittal letters sending $103,078.49 on 02/02/2018 and 02/15/2018). Even after ARC refusing to provide an accounting despite repeated requests, Frank sent them what he believed to be their correct portion of the funds.

Importantly, when sending the $103,078.49 to ARC on 02/02/2018 and 02/15/2018, Frank asked ARC to let him know if they disagreed with his calculations. See Exhibits A38 and A39. He specifically stated: "It appears to us that this check should clear the funded invoices in question. If you believe that a different amount is correct, please provide us the numbers and we can review them." ARC did not respond. This money was sent even after ARC threatened to sue SKI, threatened to contact Walmart and put liens on the Walmart properties (in Steiber's letter of 01/21/2018 shown as

Exhibit A25) and after Walmart notified Frank on 02/02/2018 that it was terminating the 12 year relationship. (See Exhibit A34).

Frank kept ARC informed with regular communications of his efforts with Walmart to correct the address so no more checks would be misdirected. See Barry Frank Declaration attached as Exhibit A and attached Exhibits A3, A7, A8, A10, A13, A14, A18, A20, A24, A31. These emails show Frank was not concealing anything and was trying to work through and correct the misdirected checks in order to maintain the business relationship with ARC which was a critical source of revenue for SKI. As for fraudulent intent, it has been said that "since fraud thrives in the shadows, a debtor who asks openly, without any attempt at concealment, and whose actions can be clearly seen, can negate fraudulent intent." In re Gamble-Ledbetter, 419 B.R. 2d 682, 696 (E.D. Tex. J. Parker 2009) (citing Rainey v. Davenport), (In re Davenport), 353 B.R. 150, 200 (Bankr. S.D. Tex 2006). Moreover, one can wrongfully appropriate property while acting under an erroneous belief of entitlement. Matter of Miller, 156 F. 3d 98 (5th Cir. 1998) (misappropriation no finding of embezzlement).

Of critical significance in this case, Frank did not abscond with any of the funds. Rather, he sent ARC no less than $172,813.32 to cover or pay for all but 3 of the checks when Walmart sent checks after ARC stopped doing business with Frank. See Exhibit A43, a flow chart of what he paid and when. These payments were to cover $204,613.06 of the ARC actual funded account. The difference of $31,297.74 Frank believed could have been recovered by ARC from the Reserve Account as a chargeback since there were ample funds to cover it in the amount of at least $79,239.34 as represented by ARC and probably closer to $415,951.68. See Plaintiff's Summary Judgment Exhibit 4-C.

(Although Plaintiff's Exhibit 4 Declaration of Delos Braddock Gurney, Jr. is not sworn before a Notary Public and is objectionable as not proper or admissible summary judgement evidence on that basis). See Chapter 7 Trustee Christopher J. Moser's Complaint filed by Richard Bufkin on February 28, 2020 in Case No. 18-42131 and Adversary No. 20-04035 (Exhibit A48). Furthermore, ARC recovered from the Reserve Account on June 16, 2017 without telling Frank and tricked him in their meeting on June 20, 2017 into agreeing to allow them to keep an extra 10% of Walmart checks by funding 75% instead of 85% until the $65,258.68 was repaid, despite the fact that ARC had already taken the money from the Reserve Account four days earlier. See Barry Frank Declaration, Exhibit A-paragraph 6. Then ARC refused to give Frank a proper accounting as to where they stood on the repayment despite repeated requests. See Exhibits A31, A36 and A39. This was double dipping and extortion in clear violation of the PSA provision prohibiting ARC from "willful misconduct."

At best, ARC may have a claim for breach of contract against Frank for not sending the checks within 24 hours of receipt. However, a breach of contract is not sufficient to make a debt non-dischargeable, even though there is no excuse for the subsequent breach. In re Minardi, 356 B.R. 171 (E.D. Tex. J. Parker 2015), Turbo Aleae Inv. Inc. v Borschow (In re Borschow), 454 B.R. 374, 395 (Bankr. W.D. Tex 2011).

Plaintiffs have shifted their argument in their initial complaint from larceny to embezzlement since they could not prove that Frank had anything to do in causing the misdirected payments from Walmart. In desperation, they are now trying to prove embezzlement to avoid a discharge of their claim. But they have failed to prove embezzlement by preponderance of the evidence since Frank's conduct was open, honest,

Case 19-04001    Doc 59    Filed 02/28/20    Entered 02/28/20 13:36:25    Desc Main
Document     Page 12 of 17

and with no concealment or intent to deprive ARC of their money. Indeed, Frank was trying to correct the misdirected payments from Walmart, send ARC its appropriate share of funds all in order to keep his business going. He depended on ARC for the flow of money for future operations. He acted with hope that the parties would work through their differences on the handling of the checks. In addition to sending them the full amount of the funded portion of the checks, he asked them to let him know if they disagreed with his deposit of his portion of the funds in which he already had an interest. See Exhibits A36 and A39. Where the debtor uses funds in which he has an interest, although technically a violation of the contract with the creditor, that is not embezzlement to avoid discharge of creditor's claims under 11 U.S.C. 523 (a)(4). In re Birkenbile, 2014 W.L. 797743 (E.D. Tex. J. Parker 2014).

At all times, Frank was acting with the hope and expectation of saving the business, cooperated with ARC by wiring funds and sending checks, and used the funds not for personal benefit, but in the ordinary course of business only after ARC terminated the PSA. Frank's dominant motivation was to apply his entire effort and resources to make the business survive and ultimately work it out with ARC. But ARC quit him. This conduct by Frank is not embezzlement. In re Littleton, 942 F. 2d 551(1991). Where there is no fiduciary relationship and no proof of fraudulent intent, there is no embezzlement. In re Cravanes, 2014, W.L. 505189 (E.D. Tex. J. Parker 2014).

Fraudulent intent may be negated by the fact that Frank applied the funds openly without any intent at concealment. In re Harrell, 94 B.R. 86 (W.D. Texas 1988). Where there was no fraudulent deprivation of ARC funds by Frank, there is no embezzlement under § 523 (a)(4) which would bar discharge of the debt. In re Meyers, 52 B.R. 901

Responses to Plaintiff's Motion for Summary Judgment                                   Page 12 of 16
In Re: Frank v AER
Case No. 18-42131
Adversary Case No. 19-04001

(1985).

3.  <u>Frank can controvert ARC's claims, damages and summary judgment evidence.</u>

The PSA and Guaranty provide that SKI or Frank do not release or exculpate ARC from any liability arising from ARC's "willful misconduct." Plaintiff's Summary Judgment Exhibit 1, 14.07, pg. 13.

The record is replete with instances where ARC committed the following willful acts injurious to Frank:

a.  Took $65,258.65 from the Reserve Account on 06/16/2017 and turned around on 06/20/2017 and failed to disclose the taking but further extorted an additional 10% in compensation from the contractual 85% to now 75% that went on for months without providing an accounting. See Barry Frank Declaration paragraph 6 and attached Exhibit A2, A256, A31, A36 and A34;

b.  Failure to apply any of the $172,813.32 SKI payments toward the actual invoices being paid for thereby generating baseless additional fees;

c.  Threatened Frank with a lawsuit and liens against Walmart on 01/19/2018 in spite of the many good faith efforts Frank was making to correct the misdirected payments that he did not cause. Exhibit A25;

d.  Exactly two (2) weeks later, on 02/02/2018, despite exemplary reviews by Walmart stores and a 10 year relationship, this action by ARC caused Walmart to terminate its business relationship with Frank, resulting in 100 people losing their jobs and destroying a $2,000,000 gross revenue business. Exhibit A - Frank Declaration, paragraph 14, and attached Exhibit A34.

e.  ARC creating their "Buyout Calculation Report" in June of 2018, closing

the SKI account, only to reopen the account to generate additional frivolous fees and then closing the SKI account again by creating their "Buyout Calculation Report" dated January 2020. (Exhibits A44 and A45).

The Settlement Agreement in Frank's personal bankruptcy was only between the Trustee and SKI, not Frank individually. Plaintiff's Summary Judgment Exhibit 5. The assignment of "any and all claims and causes of action which it (SKI) may have against a third party, was only those that SKI had against ARC, not those that Frank had. To think otherwise would mean that the Chapter 7 Trustee must intervene in this Adversary Proceeding to argue Frank's case and defend the dischargeability of ARC's claim. That would be absurd.

Judge Parker has already decided this issue on 01/09/20 when denying in part Plaintiff's First Amended Motion to Dismiss Defenses (Dkt.48). He wrote that Frank retains his general defenses to determine the amount of any liability. He wrote that: "These allegations are clearly offered as general defenses to the Plaintiff's calculation of the indebtedness sought to be rendered nondischargeable in this proceeding, regardless of whether they technically constitute an affirmative defense. Accordingly, because Rule 8(e) directs the court to construe pleadings in a manner promoting justice, the parties should deal with the allegations of ¶¶ 7-14 of the answer collectively as offering a general defense to the amounts which the Plaintiff seeks to recover in this proceeding and also potentially applicable to the various affirmative defenses…" Frank has very clearly outlined what invoices were in fact paid for by all the funds, totaling $172,813.32 he sent to ARC plus allowing their chargebacks for any other funds due from his Reserve Account. See Declaration of Barry Frank, Exhibit A, especially Exhibit A43, which

charts in detail all the transactions involved in this suit.

Therefore, there are several material issues of genuine fact whether Frank committed any fraud at all precluding ARC's summary judgment.

4.    <u>ARC is NOT entitled to attorney fees</u>.

If the "debt" giving rise to Plaintiff's attorney fees is deemed non-dischargeable, then its contractual right to attorney fees is invalid and unenforceable.

ARC failed to make a demand or presentment the SKI required to be made for the recovery of attorney fees under Texas Civil Practice and Remedies Code Section 38.002(2), <u>In re Harwood</u>, 404 B.R. 366 (E.D.Tex. J. Parker 2009).

## Conclusion

There is a genuine issue of material fact in this case whether Frank committed fraud. Frank asked for direction from ARC in good faith disclosing to ARC the accidental receipt of the Misdirected Checks, openly cooperated with ARC to wire funds, and send checks and reasonably requesting an accounting and feedback if they disagreed. This was all done after ARC terminated the PSA and in an attempt to save his business. In return, Frank got no accountings and little cooperation from ARC except threats and a tortious interference with his business relationship with Walmart that entirely destroyed his enterprise.

Respectfully submitted,

*/s/ Daniel C. Durand III*

DANIEL C. DURAND III
Attorney for Defendants
DURAND & ASSOCIATES, P.C.
522 Edmonds, Suite 101
Lewisville, Texas 75067

(972) 221-5655
(972) 221-9569 Fax
State Bar Card No. 06287570
durand@durandlaw.com

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing Defendant's Responses to Plaintiff's Motion for Summary Judgment and Brief in Support has been served on Plaintiff by and through its attorney of record, Eric L. Scott, Scott Viscuso, PLLC, 1105 North Bishop Avenue, Dallas, TX 75208, escott@sv-legal.com and Kyle W. Johnson, Esquire, 8024 Brentwick Circle, Plano, Texas 75024 via regular United States mail and by email at kyle@kwjlaw.com on this the 28th day of February, 2020. Furthermore, a true and correct copy of the foregoing was electronically filed with the Clerk of the United States Bankruptcy Court pursuant to its CM/ECF system which would then electronically notify the CM/ECF participants in this case.

*/s/ Daniel C. Durand, III*

Daniel C. Durand, III